NO. 13-20022

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

STEVE HOBART and PAM HOBART,
Individually and as Representatives of the Estate of Aaron Hobart,
Plaintiffs-Appellees,

v.

JESUS ESTRADA and BONNY KRAHN
Defendants-Appellants

On Appeal from the United States District Court
For the Southern District of Texas, Houston Division
C.A. No. 4:09-CV-3332

APPELLEES' BRIEF

Susan E. Hutchison
State Bar No. 10354100

Kern A. Lewis
State Bar No. 12295320
Wes Dauphinot
State Bar No. 00793584
Hutchison, Lewis & Dauphinot, P.C.
611 S. Main St., Ste. 700
Grapevine, TX  76051
(817) 336-5533
817.336.9005 fax
ATTORNEYS FOR APPELLEES

ORAL ARGUMENT REQUESTED

## CERTIFICATE OF INTERESTED PERSONS

NO.   13-20022

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

STEVE HOBART and PAM HOBART,
Individually and as Representatives of the Estate of Aaron Hobart,
Plaintiffs-Appellees,

v.

JESUS ESTRADA and BONNY KRAHN
Defendants-Appellants

The undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualifications or recusal.

1.  Steve and Pam Hobart, Plaintiffs

2.  Hutchison, Lewis & Dauphinot, P.C.
     Susan E. Hutchison
     Kern A. Lewis
     Wes Dauphinot
     S. Rafe Foreman, of counsel
     Attorneys for Plaintiff

                                   s/Susan E. Hutchison
                                   Susan E. Hutchison
                                   Hutchison, Lewis & Dauphinot, P.C.
                                   611 S. Main St., Ste. 700
                                   Grapevine, Texas  76051
                                   (817) 336-5533
                                   Attorneys for Plaintiffs-Appellees

## REQUEST FOR ORAL ARGUMENT

The Plaintiff-Appellee, Steve and Pam Hobart, Individually and as Representatives of the Estate of Aaron Hobart, respectfully request oral argument. This case presents some important policy issues. Oral argument would assist the Court by allowing the parties to respond to specific inquiries. Oral argument would assist the Court by allowing the parties to bring life and dimension to the circumstances and the applicable law.

# TABLE OF CONTENTS

**CERTIFICATE OF INTERESTED PERSONS** .................................................... i

**REQUEST FOR ORAL ARGUMENT** ................................................. ii

**TABLE OF CONTENTS** ................................................................. iii

**TABLE OF AUTHORITIES** ............................................................ iv

**I.  STATEMENT OF THE FACTS** ..................................................1
  A.  Aaron Hobart .................................................................1
  B.  Stafford Police Department ..........................................2
  C.  February 18, 2009 ..........................................................4
  D.  General Order on Handling Mentally Ill Persons .......18

**II.  SUMMARY OF ARGUMENT** .................................................33

**III.  ARGUMENT** ......................................................................34
  A.  Qualified Immunity .......................................................34
  B.  Officer Estrada .............................................................36
  C.  Chief Krahn .................................................................41

**CERTIFICATE OF SERVICE** ......................................................50

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)** ...............51

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987)..............................................36, 40

*Bazan v. Hidalgo County*, 246 F.3d 481, 488 (5th Cir. 2001)................................37

*City of Canton*, 489 U.S. 378 at 390  (1989) n.10.....................................................43

*Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir. 2004). ...................................36

*Cozzo v. Tangipahoa Parish Council—President Government*, 279 F.3d 273, 284
  (5th Cir. 2002).........................................................................................................41

*DePree v. Saunders*, 588 F.3d 282, 287 (5th Cir. 2009) .........................................35

*Foley v. University of Houston System*, 355 F.3d 333, 338 (5th Cir. 2003).............34

*Glenn v. City of Tyler*, 242 F.3d 307, 317 (5th Cir. 2001). ....................................36

*Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009) ...............................35

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).......................................................35

*Hobart v. Stafford*, 784 F.Supp.2d 732, 746 (S.D.Tex. 2011). ....................... passim

*Lytle v. Bexar Cnty.*, 560 F.3d 404, 409 (5th Cir. 2009) ........................................35

*Malley v.Briggs*, 475 U.S. 335, 343, 341 (1986).....................................................35

*Meadours v. Ermel*, 2005 WL 1923596, at *9 (S.D. Tex. Aug. 10, 2005) .............37

*Pearson v. Callahan*, 555 U.S. 223 (2009) ............................................................35

*Saucier v. Katz*, 533 U.S. 194 (2001). .....................................................................35

*Tennessee v. Garner*, 471 U.S. 1, 11 (1985). ....................................................37, 49

*Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001)..............36, 40, 49

*Valle v. City of Houston,* 613 F.3d 536, 547 (5th Cir.2010),...................................45

*Wallace v. Cnty. of Comal*, 400 F.3d 284, 289 (5th Cir. 2005)..............................36

## I.    STATEMENT OF THE FACTS

### A.    Aaron Hobart

Aaron Hobart was born on April 27, 1989 to Pam and Steve Hobart. USCA5 3053. He was a nineteen year old kid who, at the time of his death, was 5 feet nine inches tall and weighed 166 pounds. USCA5 3029.

Throughout high school, Aaron had become increasingly less focused on his academics. USCA5 3053. As an incentive to improve his grades, Aaron's parents offered to allow him to participate in a program in Italy that he wished to visit. *Id*. When he returned from Italy, Aaron began exhibiting obsessional behavior and "speaking in a different voice." *Id*. He was involved in an incident where he was arrested and then transferred to a psychiatric facility after being pulled over for speeding and acting strangely. *Id*. He was diagnosed with schizoaffective disorder and prescribed Haldol. *Id*. In July 2008, Aaron was referred for treatment to Dr. Scott Moreland, a licensed psychiatrist. USCA5 3048 & 3053. Aaron was under the care of Dr. Moreland at the time of the shooting. USCA 3048.

Five or six days before the shooting, Aaron began exhibiting signs of sleeplessness, reclusiveness and skipping meals. USCA5 2587. His parents initially thought it might be general "teenage moodiness," but realized after some days that maybe something else was occurring connected with his diagnosed

schizoaffective disorder. *Id*. Pam Hobart had brought Aaron's behavior up to her husband and they observed Aaron closely for a few days.

B.    Stafford Police Department

The Chain of Command at the Stafford Police Department as of February 2009 was as follows: Chief Bonny Krahn, Assistant Chief Phil Horton, Lt. Crum, Sgts.: Patrick Herman, Kelly Wright, Bob Richards, James Leedom, Corporals: Claborn, Dave Pham and Richard Novak, Alvin Mutchler, Raphael Virata, Jason Horton, Linda Roman, Preston Ousley. USCA5 2453-2454.

1.    Chief Bonny Krahn

Bonny Ray Krahn has been the Chief of Police in Stafford Texas since 1973. USCA5 2451. He began working as a patrolman in Stafford in 1970 at age 21. When he began as a police officer there was no formal training. "They gave me a badge, said go buy a gun and go to work." USCA5 2452. By age 24, he had been appointed Chief. USCA5 2452. Chief Krahn testified that the City Council gives him the authority to write the rules, regulations and procedures for the department. USCA5 2457. Chief Krahn was present during the deposition of Officer Estrada. He testified that he had no criticisms of Officer Estrada's conduct at the Hobart residence on the day of the shooting and that it was in compliance with the operating procedures of the Stafford Police Department. USCA5 2451. Chief Krahn's authority as delegated by the City Council is "the supervision,

2

implementation and overall purview of the police department." USCA5 2472.

2.     Sgt. Dusty Claborn

Sgt. Claborn has been with the City for seventeen years. USCA5 2464. He obtained his Texas peace officer's license through the academy in 1994, USCA5 2464. Has been the training sergeant for the City since 2/25/09 (USCA5 2465) but has been involved in the training aspect of police work at the City since 1998 or 1999. USCA5 2466. Sgt. Claborn was produced pursuant to 30b6 notice asking for the person with knowledge of training, crisis intervention training and use of force. USCA5 3079. Nobody at City knows more about the general orders than him except Chief Krahn. USCA5 2468.

3.     Jesus Estrada

Officer Estrada is six one and weighs 190 lbs. USCA5 2534. He was hired by the City of Stafford in September 2007, USCA5 2535. His academy training was prior to employment with the City, but after he was hired, the City provided "field" training by having him accompany other officers in the field who evaluated his performance. USCA5 3005-3020. On his duty belt he carries a Glock .45 caliber pistol, an ASP baton, a flashlight, handcuffs, and pepper spray. USCA5 2530.

C.    February 18, 2009

On February 16, 2009, Mrs. Hobart called Dr. Moreland's office and asked for an appointment for Aaron that day. USCA5 3071.   Dr. Moreland's office assistant asked whether Aaron was a danger to himself or others and Mrs. Hobart stated that he was not and that he had no homicidal or suicidal thoughts.  Id.  An appointment was scheduled for February 18, 2009 at 1pm.  *Id.*  On February 18, 2009, Mrs. Hobart called Dr. Moreland's office and told them that Aaron would not come out of his room.  USCA5 3072.  She reported that Aaron was yelling but that he "has not been physically aggressive or violent."  *Id.*  Mrs. Hobart told the nurse that she did not want to call the police and was assured that Dr. Moreland would contact her.  *Id.*

Mrs. Hobart called her husband at work to tell him that Aaron was resistant to keeping his doctor's appointment.  USCA5 2588-2589.  Mr. Hobart immediately went home, where his wife and his two sons were in the house.  *Id.*  Aaron's older brother, Chris, also lived at home while attending college.  *Id.*  Mr. Hobart went to see how Aaron was doing and noted that Aaron was talking belligerently, abusively and "speaking in an alternate voice," a hoarse, whispered voice.  USCA5 2589.  When Mr. Hobart entered Aaron's bedroom, Aaron was pacing back and forth.  Aaron told Mr. Hobart to "get out."  USCA5 2590.  Mr. Hobart told Aaron that he was going to stay because he was concerned about him and stayed in Aaron's room, listening and observing.  *Id.*  At one point, Aaron walked over to his

4

father, put his hand on his father's shoulder and called him a "piece of shit." USCA5 2591.  Mr. Hobart responded by telling Aaron that he loved him.  *Id*.

Dr. Moreland had called a prescription into a nearby pharmacy to assist with managing Aaron.  Mr. Hobart went to pick up the medication and then brought it home and told Aaron that he did not have to go the doctor right away, but that he did have to take his medication.  USCA5 2592—2593.  Aaron refused to take the medication.  *Id*.

Dr. Moreland talked to Mrs. Hobart at approximately 12:30 p.m. on the 18th. USCA5 3074.   He also forwarded to Mrs. Hobart an email explaining the medication that he had called in to the pharmacy for Aaron and he provided her information from a Houston website for a "crisis team."  USCA5 3049-3050.  He instructed Mrs. Hobart not to hesitate to call for the crisis team.  *Id*.   The information provided related to the CIT program, the assistance that a "CIT officer" can provide and instructs the reader as follows:

> "If the situation is an emergency, dial 9-1-1.  When you are transferred to a police department call taker, request a CIT officer."
> *Id*.

Mrs. Hobart followed the instructions and called the Stafford Police Department and specifically requested a CIT officer.  USCA5 2850.  She was calling for help to get her son to the hospital.  USCA5 2850.  She was under the impression that the CIT person was going to explain the procedures to her.

USCA5 2598.  Sgt. Claborn acknowledges that it is reasonable to believe that Mrs. Hobart had an expectation that the person responding to her call would be trained with respect to crisis intervention.  USCA5 2509.

There was clearly nothing that Aaron Hobart did prior to the arrival of Officer Estrada that could be classified as a crime.  USCA5 2500. Aaron Hobart was not a criminal suspect and was not under arrest.  There is nothing in the records reflecting that he had been violent, that he had hurt anyone or that he had threatened to hurt anyone.  Dr. Moreland's records specifically show that Aaron had made no threats and that the Hobarts did not consider him to be a danger to himself or others.  USCA 3071-3072.

Officers Claunch and Garcia were the primary officers dispatched to the Hobart house, Estrada just happened to get to the scene first.  USCA5 2548—2549. Although Stafford's written policies require that two officers respond to such calls, the practice in the Stafford police department was that it is allowed for a solo officer to go in alone even on a mental health call.  USCA5 2549-2550.  The written policy says that there must be two officers.  USCA5 2997.   However, the City's practice and custom allowed Officer Estrada to enter alone and handle the call by himself.  USCA5 2553.

Officer Estrada was aware through dispatch before his arrival at the Hobart home that Aaron Hobart was suffering from hallucinations.  USCA5 2546.  He also

knew that Aaron Hobart was off of his medications.     USCA5 2528-2529.

Unfortunately, Estrada was not trained to deal with a situation involving a subject

experiencing hallucinations any differently than other calls.     USCA5 2546-2547.

At his deposition, Estrada <u>could not recall any specific training regarding handling

a mentally ill person</u> other than to call an agency called Texana.     USCA5 2547.

Estrada was aware that Aaron Hobart did not have a weapon.     USCA5 2549.

Estrada knew that the call was coded as a "disturbance" and that he needed

to know why it was coded a disturbance, but he did not inquire as to what the

disturbance was and he can't recall why he did not inquire.     USCA5 2552. Estrada

was not aware where Aaron was located in the house.     USCA5 2551.     Officer

Estrada did not even ask "where is your son located?"     USCA5 2491.     He did not

ask "is he trying to hurt himself?"     USCA5 2491. He did not ask "is he trying to

hurt someone else?"     USCA5 2491.     He did not ask dispatch any of those

questions.     *Id*.     Officer Estrada did not do one single thing to obtain additional

information before he entered the house.     USCA5 2492.

Some of the reasons that it is important to know where the subject is located

is to decide how you might approach them, to decide to possibly wait for the other

officers who were dispatched, to determine whether the situation is such an

emergency that you can or cannot wait for further information and/or backup.

USCA5 2501.     Officer Estrada did nothing to find out Aaron Hobart's location

before entering and there is nothing that shows that dispatch relayed any such information.  USCA5 2501.

When Officer Estrada arrived, Aaron Hobart was not harming anyone or threatening to harm anyone.  USCA5 2502.  Stafford acknowledges that it was not up to Pam Hobart to know what information Officer Estrada needed.  USCA5 2492.

Stafford, through Sgt. Claborn, acknowledges that Officer Estrada could have exercised options to:  ask Mrs. Hobart to step outside and get more information; find out where Aaron was located and obtain additional information to allow him to be safely approached; waited for Officers Claunch and Garcia to arrive and assist; exchange information with Mrs. Hobart and allow her the option of not obtaining further police assistance.  USCA5 2509.

Officer Estrada did have the information that Aaron Hobart was hallucinating.  USCA5 2523.  In such a situation, there is no telling what the subject is going to think when they see a police officer.  *Id*.  Officer Estrada should have reasonably expected when he went in that Aaron Hobart's reaction to him might be completely unexpected.  *Id.*  Claborn confirms that Estrada did nothing to incorporate into his approach the information that Aaron Hobart was hallucinating.  USCA5 2523.  In fact, CIT training (Crisis Intervention Training) suggests an option of getting the parents out of the room with Aaron and meeting

with them first to talk about how it might be handled.  USCA5 2523.  Estrada didn't ask to meet with the parents alone first.  USCA5 2523.

When Estrada arrived, he looked in the window and saw Mrs. Hobart, who then invited him inside.  USCA5 2552.  Estrada did not contact the primaries and let them know what he was doing, as he believed he was not supposed to.  USCA5 2552-2553.  It was very quiet and did not seem like a disturbance to Officer Estrada.  USCA5 2553.  He thought everything was fine because "it was just so calm."  USCA5 2554.  Estrada entered the house and talked with Mrs. Hobart.  USCA5 2554.  Mrs. Hobart appeared calm.  USCA5 2556.  He remembers Mrs. Hobart pointing down the hallway and turning to see Aaron Hobart, who was down the hallway facing away from Estrada but then turned to see him.  USCA5 2556.  At that time, Aaron was in his room and not yelling, screaming or causing any disturbance.  USCA5 2556.

Mr. Hobart was with Aaron in his room when Estrada arrived.  USCA5 2594.  Mr. Hobart was sitting on the floor and Aaron was still pacing.  *Id.*  When Aaron began leaving his room, Mr. Hobart called out "here he comes."  *Id.*

Estrada says Aaron Hobart roared like a lion and then "charged" at him.  USCA5 2557, 2576.  Such an allegation is not supported by Mr. Hobart, Mrs. Hobart or the recording that is USCA5 3000.  Claborn says he heard the whole event on the mic recording, even all of the thumps and bumps.  USCA5 2494-

2495.  Such an alleged roar would be reflected on the recording, Id.  But the recording does not reflect any "roar" out of Aaron Hobart.  USCA5 3000 is a disc that contains a copy of the video from Officer Estrada's vehicle and microphone.  It shows Officer Estrada arriving at the home and going inside and it contains recording of the verbal exchange inside, followed by video of Estrada exiting the home after the shooting.

Aaron was down a hallway and approximately 30 to 40 feet away from Estrada when Estrada saw him.  Estrada tried to back away further.  USCA5 2558.  Estrada alleges that before he could take a single step, Aaron crossed the 30 to 40 feet and was attacking him.  USCA5 2558. Estrada's thought at that time was "oh, shit; oh, shit."  USCA5 2558; 2576.  Aaron was a nineteen-year-old kid who was barefoot, in shorts and a t-shirt, who was four inches shorter than Estrada and unarmed.  USCA5 3029; 2558.  Yet Estrada was afraid.  USCA5 2558—2559.

In his deposition, Officer Estrada was able to retrieve his ASP baton from its holster in less than a second.  USCA5 2559.  When asked in his deposition why he didn't use it on Aaron, he first said it was because he got struck in the face.  USCA5 2559—2560.   But then when confronted with his statement, Estrada changed his testimony and said he didn't use it because it got "stuck" in his holster, although he can't explain how it would get "stuck."  USCA5 2560.  Estrada could not say how long it would take him to unholster his pepper spray.  USCA5 2561.

Claborn is aware of nothing that would have indicated to Estrada that his ASP baton, his pepper spray or his flashlight would not have been effective weapons. USCA5 2518.   Estrada could have used balance displacement or take down methods. *Id.*

Estrada says that Aaron ran down the hall and then hit him "to the point where [he] was disoriented for a second or two." USCA5 2562.  He cannot recall if that was before or after he yelled "stop, get back." USCA5 2564.  Estrada then remembers being against the wall and down, trying to key up his radio. USCA5 2576.  He clarifies in his statement that he was "hunched, leaned over" and that his "butt" was "against the walls." USCA5 2581, 2582.  He remembers then getting hit in the head by Aaron Hobart, then seeing a hand and then things getting "blotchy," hearing a "woooo" noise and then he heard the ringing of a gunshot. USCA5 2577. Then he remembers being on his side on the ground, trying to get his hand back around his gun again and hearing yelling.  USCA5 2577.  He remembers someone grabbing his vest and he thought it was Aaron and that Aaron wasn't down.  USCA5 2577.  He thought Aaron was coming after him again and if he could have gotten his hand around his gun, he would have shot again.  USCA5 2568.  It was actually his fellow officer trying to help him (USCA5 2569) but Estrada was "still in imminent fear." USCA5 2569.

Estrada "remembers" Aaron being bigger than him (USCA5 2582) but in fact, Aaron was approximately four inches shorter and thirty pounds lighter. USCA5 3029.

Estrada contends that he lost consciousness as he was firing. USCA5 2583. However, he cannot even testify that he was hit with a fist—he believes that it was, but he can't really say. USCA5 2570—2571.

Estrada actually told hospital personnel that he got hit on the left side of his face, but he did not know how. USCA5 2571. This follow up ensued in the deposition:

Q:    Right. And so at the time you didn't even know that you got hit or how. And what I want to know is: who put that idea in your head that it was Aaron Hobart that hit you in the head:

A:    Once I learned from my attorney, sir.

Pam Hobart testified to a different scenario than the one offered up by Estrada. Aaron was in his bedroom. Looking down the hall and seeing Officer Estrada in the foyer, Aaron ran toward the front door flailing his arms. USCA5 890—892. Officer Estrada raised his arms up and Aaron's flailing hands hit Officer Estrada's arms. *Id.* Aaron did not hit Officer Estrada in the head. *Id.*

As the flailing occurred, Aaron and Officer Estrada pivoted around where Aaron was closer to the door and there was a separation between them of 2 to 3

feet.  USCA5 2597.    That is when Estrada pulled his gun.  *Id*.  Mrs. Hobart had been about to step between Aaron and Estrada, but when he pulled his gun, she stepped back at the point where the hallway was and closed her eyes as Estrada began to fire.  *Id*.

Officer Estrada had a semi-automatic weapon, so he squeezed the trigger at least six separate times.  USCA5 2510.  His weapon holds 14 rounds and there were seven left in the gun after the shooting, so there is one round that they cannot account for.  USCA5 2510—2511.

Estrada doesn't remember firing the gun and he could hear somebody firing but didn't even know who was shooting at the time (even though it was he, himself).  USCA5 2565. USCA5 2577 (see also USCA 2569):

Q:    You don't know who you're shooting at or what you're dong?  You're just shooting?

A:    As far as I knew, sir.

He was trained that if he was seeing stars and blackness, he better shoot. USCA5 2565.  He was trained to shoot even if he didn't know who he was shooting at, how many bullets he shot or who all was around at the time.  USCA5 2566.

Estrada cannot say where Aaron was when he began shooting—even whether Aaron was on the ground or bent over.  USCA5 2566.  He is not sure

where Mrs. Hobart was when he was shooting and has no idea about Mr. Hobart's location.  USCA5 2566.  An excerpt from USCA5 2567:

Q:    You don't know where Claunch was.  You don't know where Garcia was. You never even saw Mr. Hobart.  And you don't know where Pam Hobart was. Right?

A:    Correct

Q:    And you don't know that you were shooting Aaron Hobart, do you?

A:    At the time it was—no, sir.

……….

Q:    So you can't mark where anybody was at the time you fired seven shots out of your Glock .45 caliber?

A:    I suppose so, sir….I don't know

USCA5 2568.

Q:    What's your recollection of where Aaron was when you started shooting?

A:    I don't remember, sir.

USCA5 2568

Estrada says he remembers "a fist coming" at him and "the blackness getting into" him and that's all he recalls about beginning to shoot.  USCA5 2568.  He has no recollection of how many times his gun was fired.  USCA5 2555.  He doesn't even know that he shot a bullet through the front door.  USCA5 2567.  He cannot

14

testify where he was when he fired the shots.  USCA5 2567.  Estrada cannot remember if his eyes were open or closed when he shot his gun.  USCA5 1138.  His statement says that he "opened his eyes" after he shot his gun.  USCA5 2577.

Officers Claunch and Garcia were so close behind Officer Estrada that they arrived while he was still yelling into his microphone.  USCA5 2502.

There is nothing that would have prevented Officer Estrada from waiting a matter of SECONDS for Officers Claunch and Garcia before entering the home.  USCA5 2502.  But Sgt. Claborn believes  it to be objectively reasonable for Officer Estrada to have failed to wait.  USCA5 2503.

Officer Estrada contends that Aaron Hobart was inflicting serious bodily harm upon him, but even Sgt. Claborn acknowledges that the photos of Officer Estrada taken immediately after do not reflect any injury indicating a potentially lethal blow or even a blow that would result in unconsciousness.  USCA5 2505.  Claborn admits that there is nothing in the photos that is consistent with Officer Estrada being rendered unconscious by Aaron Hobart and he has not seen any evidence that would be consistent with being rendered unconscious.  USCA5 2506.  Even Estrada admits that there is no bruising in the photographs of his purported injuries, nothing other than redness on the left side of his face.  USCA5 2564.

At least five rounds were fired out of the pistol. Described at autopsy (but not sequenced) was wound III, a shot to Hobart's right hip area. USCA5 3032;

2990.  It was the only wound that had stippling.  *Id*. Stippling is in part, the tattooing of burned and unburned powder that is in close proximity to the muzzle of a firearm expending a round.  USCA5 2993, Report of Damon Fay.  This projectile, destroying the spinous process of the 3rd and 4th vertebrae would likely have effectively felled Aaron Hobart. *Id*.

Wound II is of the right lower back but lacks stippling or muzzle imprint. That typically means it was more distant. *Id*.  Wound IV is a gunshot of the right flank but shares a shored exit feature along with Wound I, the fatal round to the right upper neck. *Id*.  The shored exits of both of these wounds indicate that the body of Aaron Hobart was against an unyielding surface whereby the round was trapped and could not exit through its path. *Id*.  The shored exit is a signature wound that aligns the body against a surface capable of stopping a fired bullet. *Id*. Aaron Hobart was on the ground and facing away when those rounds were struck him. *Id*. (emphasis added).

The Glock pistol, capable of auto-feeding subsequent rounds, may be fired in very rapid sequence if the trigger is staged. *Id*.  Staging actuates rapid fire of subsequent rounds with very little rearward trigger travel. *Id*.  Since "controlled pair" rounds are taught at police firing ranges nationwide, staging of the trigger is an important discipline to learn and use. *Id*.  But, the unsighted and instinctive firing that was employed by Officer Estrada requires muzzle and trigger discipline.

16

*Id*. It was undisciplined staging of the trigger. *Id*. With rounds fired after the collision with Estrada, they had no ability to call back previous injury or stop viable future threat. *Id*. The threat had passed. Facial or head impact was no longer viable. *Id*. And Aaron Hobart was outbound from Estrada when he was shot. *Id*. To that, the unsighted firing of the Glock in the hands of Estrada, was felling Hobart and in doing so placed him in an inferior position. *Id*. Subsequent rounds entered Hobart from the right or wholly from behind while he was on the floor. *Id*. The training records of the Stafford Police Department do not indicate sufficiency in the manner in which unsighted, instinctive firing is taught to provide proficiency. *Id*. The undisciplined firing of the Glock in the hands of Officer Estrada killed a man and provided grave danger for an approaching cover officer. *Id*.

Officer Estrada was clearly in an emotional shambles immediately after the shooting. USCA5 3000. Sgt. Claborn asserts that Officer Estrada was following his training during the conflict, yet he admits that during the conflict (not just after), Officer Estrada was screaming and cursing—signs of panic and lack of control. USCA5 2511. The audio recording on Estrada's mic reflects Estrada yelling and cursing during the conflict. USCA5 3000. In fact, Officer Estrada was required by the City's policies to render aid to Aaron Hobart after he shot him, but was unable to do so because he, Officer Estrada, was so out of control that he was

sobbing uncontrollably on the front lawn and took off his duty belt and handed it to someone he didn't know.  USCA5 3000; 2511—2512.    There are no records that reflect that Officer Estrada sustained any significant injury as a result of his encounter with Aaron Hobart.  USCA5 2525.

Officer Estrada was "overheated" after the event and removed his duty belt, removing all of his gear, but has no idea what he did with it, who he gave it to, if anyone, or who took possession of his weapon.  USCA5 2533.

Officer Estrada left the scene and immediately went to the hospital.  He had his lawyer employed by the time he arrived at the hospital.  USCA5 2531.

Estrada believes that everything that he did was in compliance with his training that he received and the policies and practices of the Stafford Police Department.  USCA5 2532.

D.    General Order on Handling Mentally Ill Persons

Certainly, Officer Estrada did not appear to be familiar with any of the procedures contained in the Order 25 produced by the City.  For example, the General Order 25 requires the officer to use the least amount of force necessary (USCA5 1292), to receive a specific list of answers to questions (USCA5 1291) and other matters.  Estrada had no idea that there were such requirements in a written Order at Stafford.  He specifically testified that he was not aware that he had to treat mentally ill people differently than the rest of the population.  (USCA5

2545).  He was clearly not aware of a policy requiring him to use the least amount of force necessary.  (USCA5 2539).

      4.     Crisis Intervention Training

      a)     CIT Training Mandated by TCLEOSE (Texas Commission on Law Enforcement Officer Standards)

Beginning at USCA5 2940 is a copy of the Fort Bend County Community Plan, 2007—2008 which has a purpose of "identify[ing] gaps in services regarding criminal justice issues."  USCA5 2940.  Chief Krahn is identified as the individual with the Stafford Police Department that was part of the "planning team" associated with this project.  USCA5 2943.  One of the identified problems is the "lack of an effective means for Fort Bend County law enforcement agencies to deal with mental health calls for service and mental health commitments."  USCA5 2960-2961. "According to law enforcement survey, there is a consensus to develop a program for all agencies in Fort Bend County to handle mental health issues, including mental health commitments ordered by a court or jurisdiction.  The mental health officer would be specifically trained and equipped to follow the mental health protocol as set by statute or policy expediting the process to ensure the person gets the help he or she needs*." Id.*

According to Sgt. Claborn, Chief Krahn and he both have been aware since before December 2008 of statistics from the National Institute of Mental Health

that estimate between 20 and 25 percent of the population nationwide will suffer with mental illness at some point.    USCA5 2507. They have been aware of the problem of the growing number of interactions with mentally ill individuals statewide.  USCA5 2504.  Neither Chief Krahn nor Sgt. Claborn were aware of any self-evaluation plan by the Stafford Police Department for persons and services affecting mental illness.  USCA5 2461; USCA5 2469.

Claborn acknowledges that CIT training has been mandated by TCLEOSE since before December 2008 and that there are studies such as the one in Phoenix, Arizona which recorded that CIT training increased their safety by 70 percent.  USCA5 2522-2523.    CIT training gives the officer additional knowledge to try and recognize certain behaviors and some specific tactics and techniques to use to hopefully deescalate a situation if it's already volatile or to keep a situation from escalating.  USCA5 2522—2523.   It is not unusual for an encounter with someone who is mentally ill to escalate into violence and that is a large part of the focus of CIT training, to prevent such escalation. *Id.*

It was approximately 2005 when TCLEOSE recognized the need for police offers to have specific training for dealing with the mentally ill and required training for each officer.  USCA5 2459.  Everyone had to have their TCLEOSE mandated 16 hours of crisis intervention training done by August 2008.  USCA5

2459; 2460. Prior to the Hobart shooting, there was no one at the department who was qualified to provide CIT training. USCA5 2460.

Stafford began a process in December 2008 to make sure they were in "compliance" with the necessary crisis intervention training USCA5 2469—2470. TCLEOSE was mandating that the City provide trained CIT officers to provide crisis intervention training. The City did not send anyone for such training until August 2009—six months after Aaron Hobart was killed. USCA5 2470. TCLEOSE had mandated 16 hours of "intermediate crisis intervention training" before December 2008 for those who did not receive it at the academy. USCA5 2470.

There was no field training in crisis intervention before February 18, 2009. USCA5 2510.

b)     Estrada did not have required CIT training

Claborn says that Estrada qualified as CIT trained because his 16 hours in academy training is "the same 16 hours of instruction that the intermediate crisis intervention contains." USCA5 2500. However, Estrada's own training records reflect that he received ZERO hours of CIT training at the academy (USCA5 3001) AND if you compare the material from the academy with the CIT training required by TCLEOSE, they are VASTLY different and Claborn acknowledges both that they are different and that it is not the same training. USCA5 2500—2501;

USCA5 2870 (material from the academy); USCA5 2890 (Intermediate CIT Training).

The academy training only has four pages out of all of the material that address crisis intervention for the mentally ill. USCA5 2870; 2518. There is nothing that reflects that Estrada had any training at all from any source about the use of weapons specifically on people who are mentally ill. USCA5 2518. Estrada himself when asked "the very first CIT training you received was on [sic] April of 2009, isn't that right?" responded "I don't know sir, I don't know." USCA5 2534. Officer Estrada testified in his deposition that the ONLY CIT training that he received was some general information at the academy and "just dealing with people in the jail." USCA5 2534. When showed the material from the academy that barely addresses interacting with the mentally ill, Estrada testified that he had never seen it before. USCA5 2535

On his training sheet, it reflects that he has "zero" hours for CIT training. USCA5 3001; 2535. So, while Estrada did receive the "basic peace officer" training that included minimal crisis intervention discussion, he did NOT receive the 16 hour training mandated by TCLEOSE. *Id*.

The CIT training that TCLEOSE required was INTERMEDIATE training of 16 hours. (USCA5 2460). Even if Estrada had some basic CIT Training at the academy, he clearly did not receive the required 16 hours of Intermediate CIT

Training demonstrated by i. the fact that he claimed to have never before seen the training manual that was produced in discovery as his academy training manual (USCA5 2535; 2870); ii. the academy was not providing the Intermediate Training prior to a specific time, which is the very reason "additional" training was necessary (USCA5 2470); iii. the training material that Estrada had from the academy was not the necessary Intermediate CIT manual, it wasn't even remotely close.   Sgt. Claborn clearly admits in his deposition that it is NOT the same training. (USCA5 2500—2501); and iv. Estrada's training records reflect that he received "zero" of the necessary intermediate CIT hours (USCA5 3003).   While the basic academy training may have briefly covered some CIT information, it was nothing close to what the State of Texas determined was necessary for basic peace officers.

USCA5 2890 is a copy of the Intermediate Crisis Intervention Training Manual.  USCA5 2870 is the portion of Estrada's Training Manual from the Gus George Academy that Defendants purport meets the state mandated requirements. They are night and day.   Estrada's manual devotes a total of three and a half pages to handling mentally ill persons (USCA5 2886-2889) (most of the chapter is dedicated to handling domestic violence calls).   There are two paragraphs dedicated to "handling a mentally disturbed or violent person." *Id*. at USCA5 2887.   The Intermediate Crisis Intervention manual is fifty pages long. *Id*.,

USCA5 2890.  Its stated purpose is "to educate law enforcement about issues pertaining to crisis intervention techniques, especially in communicating with persons with a mental illness." *Id.*, USCA5 2891.  When asked when he received his CIT training, Estrada said he received some basic CIT training at the academy "as well as just dealing with people in the jail." (USCA5 2534).  Defendants produced in discovery Estrada's training manual from Gus George Academy. (USCA5 3001).  In his deposition, Officer Estrada claimed to have never seen it before.  (USCA5 2535).

Furthermore, Estrada was questioned extensively in his deposition about his training on how to handle calls with mentally ill people differently than the general population, both at the academy and by Stafford.  Initially, there were questions about CIT training and Officer Estrada simply could not answer them.  (USCA5 2545; 2546—2547).  And again, later in his deposition was this exchange regarding training provided by Stafford:

Q:    Do you recall any specific training you had that—regarding the handling of a mentally ill person?

A:    Again sir, beside the Texana thing [calling an organization for the mentally ill called Texana], I don't recall any specific.

Q:    So the only training you can recall as you sit here today is you're supposed to call Texana if you think a person is mentally ill?

A:     I don't know, sir.

(USCA5 2547)

c)     Estrada used no CIT training with the Hobarts

Knowing that it was a mental health call, Estrada should have used his CIT training.  USCA5 2503.  CIT provides "additional tools for controlling a scene safely."  USCA5 2503.  CIT training says that "variables, such as mental instability, high emotions, possible paranoia, delusions," etc. can be dangerous if they are not handled appropriately.  USCA5 2503.  A person in a mental health crisis is usually excited, alarmed, confused and feeling a lack of control.  Id.

There is a dramatic difference between regular suspect encounters and mental health subjects in the way officers are routinely expected to control conflict. USCA5 2503.    Unfortunately, Estrada testified that he was not trained to treat mentally ill people differently than the rest of the population.  USCA5 2545.  Sgt. Claborn confirms that Officer Estrada employed no crisis intervention techniques with the situation involving Aaron Hobart.  USCA5 2504.

Inexplicably, after the death of Aaron Hobart, Officer Estrada was selected to attend the "train the trainer" CIT course so that he could begin training other officers in the use of CIT.  USCA5 2504—2505.

5.     Training

The purpose of training is to "establish with them the options, the severity, the legal guidelines to give them the ability to recognize when and where a particular level of force is appropriate." USCA5 2474. The only policy that the City Council has enacted that relates to training is one that directs all city employees to comply with all in-service training. USCA5 2468. Claborn is not aware of the City Council ever initiating, creating or implementing any training regarding the use of force or crisis intervention training. USCA5 2474. Estrada acted in accordance with his training in every respect of the Hobart incident. USCA5 2485. Sgt. Claborn asserted there was nothing indicating need for additional or different training. USCA5 2485.

a)    Field training

Academy training is substantially classroom and the hands-on aspect of it is typically simulated and very controlled. USCA5 2475. Field training is when the officers go out into the field with other officers and learn "on the job." USCA5 2475. Chief Jones put together the Field Training Manual and it was reviewed by Chief Krahn. USCA5 2498. In the field training that was provided in 2008, there were four phases. USCA5 2475. Each phase had an operational task list that is documented by the training officer and the trainee. Id.

Their field training did not include putting people in shooting scenarios. USCA5 2475.   They monitored self-control during field training but not specifically as it relates to shooting situations.  USCA5 2475.

It is an important part of the field training to be evaluated on an officer's ability to remain calm and cool-headed in a crisis.  USCA5 2511.  The "control of conflict" evaluation encompasses remaining calm and cool and not reacting out of panic.  *Id*.  Panic reactions can escalate situations and escalate the use of force by the officer.  *Id*.  A person who has problems with conflict control should not be allowed to go out in the field with a gun.  *Id*.  The signs of panic reaction include upward change in voice, shaking, possibly screaming, cursing, crying, inability to breathe, inability to perform their duties, all of which Officer Estrada exhibited on the video immediately after shooting Aaron Hobart.  USCA5 2511.

Sgt. Claborn asserts that Officer Estrada was following his training during the conflict, yet he admits that during the conflict (not just after), Officer Estrada was screaming and cursing—signs of panic and lack of control.  USCA5 2511.  In fact, Officer Estrada was required by the City's policies to render aid to Aaron Hobart after he shot him, but was unable to do so because he, Officer Estrada, was so out of control that he was sobbing uncontrollably on the front lawn and took off his duty belt and handed it to someone he didn't know.  USCA5 2599; 2511-2512.

Even with respect to Officer Estrada's conduct after the shooting, sobbing and cursing and shaking and unable to breathe and taking off his duty belt and handing it to an unknown person, was all, according to Sgt. Claborn, in accordance with Officer Estrada's training.  USCA5 2511-2512.

Claborn was not aware of Officer Estrada being placed in any training situations to evaluate his ability to control a highly emotional situation and there is nothing in their training program that mandates that kind of training.  USCA5 2476.

There was no field training on dealing with mentally ill subjects.  USCA5 2536.

In field training, officers are evaluated on a numerical scale that goes from a one to a five (or "NO" for Not Observed) and a "3" is the least acceptable score (five being the highest and one being the lowest).  USCA5 2476—2477.  If they get a 3 rating or below, there is a problem that needs to be addressed, including additional training.  USCA5 2477. The things that are evaluated include officer judgment.  That is a critical area because it could mean the difference between life and death, not just for citizens but also for fellow officers.  USCA5 2486.  If that is a low score area, it needs to be addressed.  USCA5 2486.  Sgt. Claborn was not aware of any significant problems with Estrada and his field training.  USCA5

2486.   However, Officer Estrada's records show a pattern of ongoing problems with common sense, judgment and control of conflict.

b) Estrada's field training issues

In phase two of his field training, Estrada received a series of low ratings in areas that are directly related to safety.

October 17, 2007, he got a 1 in common sense, 1 in control of conflict, 1 in officer safety, 1 in communications.  USCA5 2983; 3013.  In response, his FTO told him "don't hesitate to use deadly force when protecting the lives of others, especially other officers."  USCA5 2983; 2514.

October 22, 2007, Estrada got a 1 in common sense and judgment and a 1 in officer safety.  The FTO commented that Estrada figuratively "got himself killed" during that training.  USCA5 2983; 3012.

October 23, 2007, Estrada again got a 1 in communications, a 2 in common sense and judgment and a 2 in following policies and procedures.  He received 3's in control of conflict and officer safety.   USCA5 2983; 3009.   The FTO on this training noted that another officer figuratively died as a result.  (USCA5 3010).

October 27, 2007, Estrada again got a 2 in common sense and judgment and a 2 in officer safety.  USCA5 2983; 3005 with control of conflict not observed.

<u>October 28, 2007</u>, Estrada again got a 1 in common sense and judgment, a 1 in officer safety and a 1 in communications (control of conflict was not observed). USCA5 2983; 3007

Other than "speaking about it afterward" Estrada cannot recall any additional training to address his deficiencies. USCA5 2537; 2538.

6.      Practices

Sgt. Claborn says there are times when the City allows practice to diverge from written policy, (such as Estrada not having to follow very specific general order requiring him to provide a use of force report). USCA5 2488.

a)      Use of force

Officers are not required to use the least amount of force necessary. USCA5 2516.   That's the way that they're trained by Stafford and that's in accordance with policy and practice.  Id.  "What's the least amount of force for one officer could be totally different in the same situation for another officer." USCA5 2521. Claborn agrees that you must stop the use of force when it is no longer warranted. USCA5 2485.  When asked about use of deadly force: "and how do you recognize and realize when there's actual danger versus just something you can address that's not really dangerous?"  Claborn responded:  "I don't know."   USCA5 2514— 2515.

Stafford has a policy with a use of force continuum.  USCA5 2602.  It starts with officer presence and goes up to and including verbal commands, balance displacement, take down, chemical agents, manual strikes, impact weapons and finally, deadly force.  USCA5 2602; 2613-2615; 2620.  Sgt. Claborn has used all of these methods except deadly force.  USCA5 2515.  He has been able to use the less than lethal methods to stop attacks on many occasions, even on people with weapons.  USCA5 2515-2516.  Claborn demonstrated in his deposition how quickly he could take out his asp baton—it was done in a second or less.  USCA5 2494

Officer Estrada, however, says that if a person is being resistant to an officer, he can use whichever use of force on the continuum he deems necessary. USCA5 2539. You can use deadly force whenever you believe that your life or someone else's is in danger.  USCA5 2450.  There are other criteria as well but he can't recall them.  *Id*.  There are no criteria for the use of force other than what the officer deems necessary and "that's per officer."  USCA5 2540-2541.  Estrada can't recall any training that he might have received—field or classroom—related to the psychological aspects of use of force.  USCA5 2544.

b)     Obtaining additional information

Officer Estrada did not even ask "where is your son located?"  USCA5 2491.  He did not ask "is he trying to hurt himself?"  USCA5 2491. He did not ask

"is he trying to hurt someone else?"  USCA5 2491.  He did not ask dispatch any of those questions.  Id.    Officer Estrada did not do one single thing to obtain additional information before he entered the house.    USCA5 2492.  This is in keeping with practice and with training.  USCA5 2492.

      d)    Shooting

It is ok for an officer to begin shooting as he is blacking out, potentially. USCA5 2479.  It was consistent with the training and practices of the City of Stafford for an officer who is beginning to "black out" to begin shooting.  USCA5 2479.  Claborn is aware that Estrada did not know where Pam Hobart or Steve Hobart were in the room when he began shooting.  USCA5 2479—2480.  Claborn is aware that Officer Estrada did not know where fellow officers Claunch and Garcia were when he began shooting.  USCA5 2480.  Claborn acknowledges that one of Estrada's bullets went through the front door and that had Officer Claunch been seconds earlier, she could have been shot by her own fellow officer.  USCA5 2480.

Sgt. Claborn says that even if Pam Hobart's version is true, that Aaron and Estrada had separated and she was getting ready to step in between them when Estrada began firing, that was still "objectively reasonable" and in accordance with the practices and training of the Stafford police and in accordance with the General Orders regarding use of force and use of deadly force.  USCA5 2495.

## II.     SUMMARY OF ARGUMENT

The Appellants' brief reads very much like a closing argument.  There is no acknowledgement that there are substantial and material fact issues on many aspects of this case, such as, for example, whether Officer Estrada received the required TECLEOSE training in crisis intervention.   The District Court went through a meticulous analysis of the evidence and noted when there were material fact issues.     In its proper legal analysis, the Court found that neither Officer Estrada nor Chief Krahn were entitled to qualified immunity on the excessive force or failure to train claims, respectively. Crediting the Hobarts' evidence, Chief Krahn knew that CIT training was crucial as well as mandated by TCLEOSE. Despite that, he did not provide his officers with the CIT training that would have prevented Aaron Hobart's death or the necessary training on proper use of force. The City sent an inexperienced, untrained, reactionary young man with a gun into the home of a family in need of help.  The young officer had no idea how to handle the situation and he clearly panicked.  You only have to watch the video of the event unfolding to see how terribly the situation was handled by Officer Estrada, with such tragic consequences.  Surely a police chief cannot knowingly disregard training mandates from the State without consequence or fail to properly train his officers regarding the constitutional requirements for use of force.  And just as surely, an argument that any officer would find the circumstances of the death of

Aaron Hobart objectively reasonable is insupportable.   Officer Estrada did not follow one single tenet of crisis intervention training to deal with the mentally ill. Instead, he escalated the situation, created a crisis, failed to use any reasonable method to restrain Aaron Hobart (such as asp baton, pepper spray, take down moves or holds) and, closing his eyes, shot wildly with his firearm.  He admittedly would have killed his fellow officer had he been able to pull the trigger again.  He had no idea even who he was shooting.   Had he shot Mrs. Hobart or his fellow officers, would Appellants still be arguing it was objectively reasonable?  It is only by a miracle that he didn't.  Qualified immunity is a proper tool to balance the need to hold officials accountable and the need to protect them from harassment.   This is clearly a case where these officials need to be held accountable.

## III.   ARGUMENT

A.     Qualified Immunity

Section 1983 claims against public officials in their individual capacities are subject to the defense of qualified immunity. *Foley v. University of Houston System*, 355 F.3d 333, 338 (5th Cir. 2003). "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982). This standard "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *DePree v. Saunders*, 588 F.3d 282, 287 (5th Cir. 2009) (quoting *Malley v.Briggs*, 475 U.S. 335, 343, 341 (1986)).  In examining whether an official is entitled to qualified immunity, courts "conduct the two-step analysis" outlined in *Saucier v. Katz*, 533 U.S. 194 (2001). See *Lytle v. Bexar Cnty.*, 560 F.3d 404, 409 (5th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194 (2001), overruled in part by *Pearson v. Callahan*, 555 U.S. 223 (2009)). The test requires courts to look at (1) "whether, taking the facts in the light most favorable to the plaintiff, the [defendant's] alleged conduct violated a constitutional right;" and (2) "whether the right [claimed to be violated] was clearly established at the time of the conduct." *Lytle*, 560 F.3d at 410. If a court answers "both the constitutional violation and qualified immunity questions affirmatively, the [defendant] is not entitled to qualified immunity." *Id*.

Though the Supreme Court has listed only the two steps described above, several Fifth Circuit panels have stated that the qualified immunity question involves not only an inquiry into whether the right was clearly established at the time of the conduct, but also whether the official's action was objectively reasonable in light of the rules clearly established at the time it was taken. See, e.g., *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009); *Wallace v. Cnty.*

*of Comal*, 400 F.3d 284, 289 (5th Cir. 2005) ("Even if the government official's conduct violates a clearly established right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable.").

B.    Officer Estrada

To determine whether a plaintiff has overcome the presumption of qualified immunity, a court first considers whether the plaintiff has proven a violation of a clearly established constitutional right. *Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir. 2004). A right is "clearly established" if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). If that prong is met, the court must consider whether the defendant's "actions were objectively reasonable" in light of "law which was clearly established at the time of the disputed action." *Collins,* 382 F.3d at 537. "The touchstone of this inquiry is whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law." *Glenn v. City of Tyler*, 242 F.3d 307, 317 (5th Cir. 2001). "The defendant's acts are held to be objectively reasonable unless all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated" the plaintiff's asserted constitutional or federal statutory right. *Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001).  In February 2009, when

Aaron Hobart's shooting death occurred, it was clearly established that "'deadly force violates the Fourth Amendment unless the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Bazan v. Hidalgo County*, 246 F.3d 481, 488 (5th Cir. 2001) (quoting *Garner*, 471 U.S. at 11); see *Meadours v. Ermel*, 2005 WL 1923596, at *9 (S.D. Tex. Aug. 10, 2005) ("the law is clearly established that an officer can use deadly force only when he has probable cause to believe that a suspect poses a threat of death or serious harm to the officer or others"). The threat of physical harm must be immediate. *Garner*, 471 U.S. at 11.

Whether Officer Estrada's conduct was clearly excessive and unreasonable turns on whether Officer Estrada had probable cause to believe that Hobart posed a significant threat of death or serious physical injury to Officer Estrada or to others. *Id*. There is conflicting evidence on this question, and the District Court found that "a reasonable jury could find that Officer Estrada lacked such probable cause." *Hobart v. Stafford*, 784 F.Supp.2d 732, 746 (S.D.Tex. 2011). When she called 911, Mrs. Hobart specifically requested that a CIT officer be dispatched. (USCA5 2850) She told the dispatcher that Aaron was becoming delusional and very violent, but that he was not hurting anyone and needs medication and to be in a hospital. (USCA5 2850) Therefore, based on the 911 call, there was reason for Officer Estrada or other police officials to believe that Hobart could potentially be

violent, but not that he had committed any crime or hurt anyone.

In attempting to establish objective reasonableness, the Appellants make much of Officer Estrada being "punched" in the face during his encounter with Aaron Hobart (Appellants' Brief, p. 30).  The actual evidence is that:

1.    Estrada thinks he was hit with a fist, but he can't really say (USCA5 2570—2571).

2.    Estrada told hospital personnel that he got hit on the left side of his face but he did not know how.  (USCA5 2571)

3.    When asked in his deposition who put it in his mind that Aaron Hobart hit him in the head, Estrada's answer was that he learned it from his attorney.  (USCA5 2571) (Q: And so at the time you didn't even know that you got hit or how.  And what I want to know is: who put the idea in your head that it was Aaron Hobart that hit you in the head?  A:  Once I learned from my attorney, sir.)

4.    Estrada admits there is no bruising on his head or face in the photos taken directly afterward at the hospital and nothing other than redness on the left side of his face.  USCA5 2564.

5.    Mrs. Hobart did not see her son hit Estrada in the head and she was watching the entire exchange until the point where Estrada

drew his gun.  (USCA5 890-892).

Mrs. Hobart testified that when Aaron came into the room "he was flailing with his arms," that "Officer Estrada had his arms up," and that Aaron's arms hit Officer Estrada's arms. (USCA5 890-892) Although Mrs. Hobart acknowledged that she did not "see every single strike that Aaron made on Officer Estrada, sufficient to tell us where each one landed," she did testify that she "watched them the entire time," and only closed her eyes after Officer Estrada pulled out his gun but before he fired it. (USCA5 2597.) Officer Estrada had become "disoriented" and was "seeing stars" and "darkness" coming into his vision during those moments, to the point where he did not even know that it was him shooting the gun. (USCA5 2564-2565.) Mrs. Hobart testified that the flailing stopped and "2 or 3 seconds passed" before Officer Estrada began shooting. (USCA5 2597.) She also testified that in the few seconds prior to the shooting there was "a separation of 2 or 3 feet" between Aaron and Officer Estrada, and that she had shifted her weight to go between the two, at which point Officer Estrada pulled out his gun. (*Id*.) Accordingly, if a jury were to credit Mrs. Hobart's testimony, it could reasonably conclude that Officer Estrada faced only minor physical contact from Aaron, and that such contact ended and the two men were separated for multiple seconds prior to Officer Estrada pulling out his gun and shooting Aaron approximately six times, fatally in the back of the head.  Under that factual scenario, as concluded by the

District Court, Officer Estrada would lack probable cause to believe that Aaron posed a significant threat of death or serious physical injury to Officer Estrada or to others, and shooting Aaron in the manner that he did would be clearly excessive and unreasonable. *Hobart v. Stafford*, 784 F.Supp.2d at 747.

As discussed above, Mrs. Hobart's testimony and other evidence (such as the lack of injuries to Officer Estrada) support the Hobarts' claim that Officer Estrada did not have probable cause to believe Aaron posed a threat of death of serious physical harm, let alone an immediate threat. Shooting Aaron under that circumstance would violate clearly established law at the time. "[I]n the light of pre-existing law the unlawfulness [would] be apparent." *Anderson*, 483 U.S. at 640. Thus, genuine issues of material fact remain on this question, and the Hobarts have presented evidence of a violation of a clearly established constitutional right sufficient to defeat summary judgment.

Viewing the evidence in the light most favorable to the Hobarts, the District Court found that Officer Estrada's conduct was not objectively reasonable. *Hobart v. Stafford*, 784 F.Supp.2d at 747. If the jury credits the Hobarts' version of the facts, no reasonable officer in Officer Estrada's circumstances would have believed his conduct to be lawful. *Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001). "Given the clearly established law at the time, no reasonable officer would have believed that it was legal to shoot repeatedly at a young man whom the

officer had no reason to believe had a weapon and who merely hit the officer's arms with his flailing arms before multiple seconds passed with a two- or three-foot gap between the two men." *Hobart v. Stafford*, 784 F.Supp.2d at *748*.  Officer Estrada testified that he was blacking out at the time of the shooting, to the point that he did not even know who was shooting the gun. However, those subjective circumstances are not relevant to this objective prong. See *Cozzo v. Tangipahoa Parish Council—President Government*, 279 F.3d 273, 284 (5th Cir. 2002) ("an individual defendant's subjective state of mind is irrelevant to the qualified immunity inquiry"). Even if a police officer who uses deadly force believes he is at risk of death or serious injury, he is not entitled to qualified immunity if that belief was objectively unreasonable. The Hobarts provide evidence of a factual scenario under which Officer Estrada's use of force would constitute a violation of clearly established Fourth Amendment law, and which no reasonable officer could interpret to be otherwise.  Officer Estrada is not entitled to qualified immunity under these circumstances.

C.     Chief Krahn

Officer Estrada's use of force was clearly excessive. The Hobarts have presented evidence that Officer Estrada's actions were entirely consistent with the training he received from the SPD.

Sgt. Claborn testified that the shooting of Aaron—even if Aaron and Officer

Estrada had separated prior to the shooting, meaning that the two were no longer in physical contact—was in compliance with SPD training. (USCA5 2495.) The District Court found that "[t]his suggests that the SPD failed to train officers regarding when the use of force, and especially the use of deadly force, is appropriate." *Hobart v. Stafford*, 2012 WL 1327785 (S.D. Tex., April 17, 2012, p. 10).

Further, Sgt. Claborn testified that the training Officer Estrada received to prepare him for this incident was the "overall firearms training," which consists of "firing until the threat is ended." (Id. at USCA5 2512.) Sgt. Claborn did not suggest that officers were trained to adjust their use of force based on the severity of the situation, or to use the least amount of force necessary. Sgt. Claborn's testimony raises a factual issue as to whether officers were trained that firing while going unconscious was only appropriate if the officer reasonably believed his life to be in danger; the testimony suggests that they were not so trained. (*Id*. at USCA5 2512.)

Chief Krahn and Sgt. Claborn have affirmed that Officer Estrada's unconstitutional actions were consistent with his training. When asked whether he had any criticisms as to how Officer Estrada conducted himself at the Hobarts' residence on February 18, 2009, Chief Krahn responded that he did not. (USCA5 2451.) He further testified that he is not aware of any information suggesting that

Officer Estrada was not in compliance with the SPD's operating procedures. (Id. at

USCA5 2451.) Sgt. Claborn has stated that he believes Officer Estrada's handling

of the situation was "objectively reasonable" (USCA5 2485), and that there was

nothing about Officer Estrada's handling of the incident that was inconsistent with

his SPD training (USCA5 2485).  The District Court found that "[t]he approval of

Officer Estrada's arguably unconstitutional conduct by both Chief Krahn and Sgt.

Claborn indicates that his conduct was consistent with the SPD's training on the

appropriate use of force. The Court therefore finds that a genuine issue of material

fact remains as to whether the SPD failed to provide adequate training on the use

of force." *Hobart v. Stafford*, 2012 WL 1327785 at p. 10. It is indisputable that

Chief Krahn knew that SPD officers would find themselves in situations where

they were required to determine what level of force to use. The City equipped its

officers with firearms, allowing them to use deadly force. And, a fact question

remains as to whether the City trained its officers when to use different levels of

force, and under what circumstances the use of deadly force would be appropriate.

In light of these facts, a jury could find that the need to train SPD officers in the

constitutional limitations on the use of force, and the use of deadly force in

particular, was "'so obvious' that failure to do so could properly be characterized

as 'deliberate indifference' to constitutional rights." See *City of Canton*, 489 U.S.

378 at 390  (1989) n.10.

In order to show that this less-thorough training was actually inadequate, and that the City knew it was inadequate, the Hobarts point to Chief Krahn's knowledge of the importance of CIT training, and the fact that he knew or should have known of the dangers of failing to provide such training. Chief Krahn knew, at least as of 2007 or 2008, that there was a "lack of an effective means for Fort Bend County Law Enforcement agencies to deal with mental health calls for service and mental health commitments." (USCA5 2961.) Chief Krahn was part of a team that found it necessary to train and equip police officers to follow a "mental health protocol as set by statute or policy expediting the process to ensure the person get the help he or she needs." (USCA5 2961.)

Moreover, Chief Krahn and Sgt. Claborn were both aware, before December 2008, that there were a growing number of interactions with mentally ill individuals and that CIT training was mandated by TCLEOSE. (USCA5 2504; 2522- 2523.) For this reason, officers in the SPD were supposed to have sixteen hours of intermediate CIT training by August 2008. (USDA5 2459.) Before Aaron's death, no one at the SPD was qualified to provide CIT training, and it was not until four months after the training was supposed to have been completed that the City began efforts to ensure its compliance with the TCLEOSE standards. (USDA5 2469.) Thus, though TCLEOSE mandated that the city have a trained CIT officer to train other officers in the SPD, the City did not send any officer to

receive such training until six months after Aaron was killed. (USCA5 2469-2470.) There was no field training in CIT at all before February 2009. (USCA5 2510.)

The Fifth Circuit has considered whether the failure to implement mandatory CIT training can constitute an actionable municipal policy under Section 1983. In *Valle v. City of Houston,* 613 F.3d 536, 547 (5th Cir.2010), the plaintiffs presented evidence that the City of Houston chose not to implement a 2004 proposal for mandatory CIT training, prepared at the direction of the Executive Assistant Chief of Police. 613 F.3d at 545. The court considered the two recommendations made in the 2004 proposal: "(1) that all patrol officers be required to complete twenty-four hours of CIT training, and (2) that all patrol sergeants be required to complete CIT training." *Id*. The court reasoned that "[t]he 2004 proposal suggests that the City recognized that mental health situations were not being adequately dealt with by CIT-trained officers and that there was a need for additional CIT training." *Id.* The court held that the City's failure to implement those recommendations raised a genuine issue of material fact as to whether "the department's decision not to implement the CIT training recommendations in the 2004 proposal constituted an official policy of failing to adequately train." *Id*. at 545.

Claborn says that Estrada qualified as CIT trained because his 16 hours in academy training is "the same 16 hours of instruction that the intermediate crisis intervention contains." USCA5 2500. However, Estrada's own training records

reflect that he received ZERO hours of CIT training at the academy (USCA5 3001; 3003) The academy training only has four pages out of all of the material that address crisis intervention for the mentally ill.  USCA5 2870; 2876; 2886-2889; USCA5 2518.  There is nothing that reflects that Estrada had any training at all from any source about the use of weapons specifically on people who are mentally ill.  USCA5 2518.  Estrada himself when asked "the very first CIT training you received was on [sic] April of 2009, isn't that right?"  to which Estrada responded "I don't know sir, I don't know."  USCA5 2534.  Officer Estrada testified in his deposition that the ONLY CIT training that he received was some general information at the academy and "just dealing with people in the jail."  USCA5 2534.  When showed the material from the academy that barely addresses interacting with the mentally ill, Estrada testified that he had never seen it before. USCA5 2535

So, while Estrada did receive the "basic peace officer" training that included minimal crisis intervention discussion, he did NOT receive the 16 hour training mandated by TCLEOSE.  *Id*.

The CIT training that TCLEOSE required was INTERMEDIATE training of 16 hours.  (USCA5 2459; p. 2460).   Even if Estrada had some basic CIT Training at the academy, he clearly did not receive the required 16 hours of Intermediate CIT Training demonstrated by 1. the fact that he claimed to have never before seen

the training manual that was produced in discovery as his academy training manual (USCA5 2535; USCA5 2870); 2. the academy was not providing the Intermediate Training prior to a specific time, which is the very reason "additional" training was necessary (USCA5 2470); 3. the training material that Estrada had from the academy was not the necessary Intermediate CIT manual, it wasn't even remotely close; and 4. Estrada's training records reflect that he received "zero" of the necessary intermediate CIT hours (USCA5 3003).   While the basic academy training may have briefly covered some CIT information, it was nothing close to what the State of Texas determined was necessary for basic peace officers.

Estrada was questioned extensively in his deposition about his training on how to handle calls with mentally ill people differently than the general population, both at the academy and by Stafford.   Initially, there were questions about CIT training and Officer Estrada simply could not answer them.   (USCA5 2545; 2546-2547).   And again, later in his deposition was this exchange regarding training provided by Stafford:

Q:    Do you recall any specific training you had that—regarding the handling of a mentally ill person?

A:    Again sir, beside the Texana thing [calling an organization for the mentally ill called Texana], I don't recall any specific.

Q:    So the only training you can recall as you sit here today is you're supposed to call Texana if you think a person is mentally ill?

A:    I don't know, sir.

(USCA5 2547)

Knowing that it was a mental health call, Estrada should have used CIT training in encountering Aaron Hobart.  USCA5 2503.  CIT provides "additional tools for controlling a scene safely."  USCA5 2503.  CIT training says that "variables, such as mental instability, high emotions, possible paranoia, delusions," etc. can be dangerous if they are not handled appropriately.  USCA5 2503.  A person in a mental health crisis is usually excited, alarmed, confused and feeling a lack of control.  *Id.*

There is a dramatic difference between regular suspect encounters and mental health subjects in the way officers are routinely expected to control conflict. USCA5 2503.    Unfortunately, Estrada testified that he was not trained to treat mentally ill people differently than the rest of the population.  USCA5 2545.  Sgt. Claborn confirms that Officer Estrada employed no crisis intervention techniques with the situation involving Aaron Hobart.  USCA5 2504.

Crediting the Hobarts' version of the facts, no reasonable officer in Chief Krahn's circumstances would have believed it to be lawful to fail to train police officers on the appropriate use of force. *Thompson v. Upshur Cnty.*, 245 F.3d 447,

457 (5th Cir. 2001). In 2009, it was clearly established that deadly force cannot be used unless the officer has objectively reasonable cause to believe that a person poses a threat of serious physical harm. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

                                           Respectfully submitted,

                                           s/Susan E. Hutchison
                                           Susan E.  Hutchison
                                           Texas Bar No. 10354100
                                           hutch@seeyouincourt.com

                                           Kern A. Lewis
                                           Texas Bar No. 12295320
                                           lewis@seeyouincourt.com

                                           Wes Dauphinot
                                           Texas Bar No. 00793584
                                           wes@seeyouincourt.com

                                           Hutchison, Lewis & Dauphinot, P.C.
                                         611 S. Main Street, Suite 700
                                         Grapevine, Texas 76051
                                         Phone:  817-336-5533
                                         Fax:   817-336-9005

## CERTIFICATE OF SERVICE

This is to certify that on this 5th day of July, 2013, a true and correct copy of the above and foregoing document was served on the following attorney of record via the court's electronic service:

William S. Helfand
Norman Giles
Chamberlain, Hrdlicka, White, Williams &
Martin
1200 Smith, Ste. 1400
Houston, TX        77002


s/Susan E. Hutchison
Susan E. Hutchison

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I certify that the foregoing BRIEF OF APPELLEES, complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B) because this brief contains 11,387 words, excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I certify that the foregoing BRIEF OF APPELLEES, complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2008 for Macs in 14 point Times New Roman.


s/Susan E. Hutchison
Susan E. Hutchison